# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| R I S M E D   O N C O L O G Y SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-13-S-310-NE |
| | ) | |
| DANIEL ESGARDO RANGEL BARON; ISABEL RANGEL BARON; RISMED DIALYSIS SYSTEMS, CORP. (Alabama); RISMED DIALYSIS SYSTEMS, CORP. (Florida); and RISMED DIALYSIS SYSTEMS, C.A. VENEZUELA, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the court on a motion for relief from judgment filed by plaintiff, Rismed Oncology Systems, Inc., pursuant to Federal Rules of Civil Procedure 60(b)(3) and 60(b)(6).[1] Plaintiff commenced this action on February 14, 2013, asserting claims against:   Daniel Esgardo Rangel-Baron, a citizen of Venezuela; Isabel Rangel-Baron, also a citizen of Venezuela; Rismed Dialysis Systems, C.A., a Venezuelan corporation; Rismed Dialysis Systems, Corp. (Alabama), an Alabama corporation; and, Rismed Dialysis Systems, Corp. (Florida),

---

[1] *See* doc. no. 7 (Plaintiff's Motion for Relief).

a Florida corporation.  Jurisdiction existed under the federal question statute, 28 U.S.C. § 1332, because the first three Counts of the complaint alleged claims based upon the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c), and (d).[2]  In addition, supplemental state-law claims of fraud and conspiracy to defraud, as well as mail and wire fraud under Alabama Code § 6-5-370, were asserted in Counts IV and V.[3]

Less than two months after commencing the action, however, and before any defendant had filed an answer or other responsive pleading, plaintiff moved to dismiss the case with prejudice, stating as the reason for doing so that "a settlement has been reached in this action."[4]  An order dismissing the action with prejudice was

---

[2] The attorneys who represented plaintiff at the commencement of this suit represented that jurisdiction also existed "pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and the action is *between citizens of different states*."  Doc. no. 1 (Complaint), ¶ 7 (emphasis supplied).  The face of the complaint demonstrated that such an assertion was patently incorrect.  The plaintiff is an Alabama corporation, as is one of the defendants, Rismed Dialysis Systems, Corp. (Alabama).  *Id.* ¶¶ 1, 2.  Hence, the complete diversity of citizenship that is absolutely essential to the existence of jurisdiction under § 1332(a) is lacking.

[3] The statutory provision cited as the basis for the claims asserted in Count V permits a party to commence a civil action to recover damages for an injury resulting from the defendant's commission of a felony offense.  *See* Ala. Code § 6-5-370 (1975) ("For any injury, either to person or property, amounting to a felony, a civil action may be commenced by the party injured without prosecution of the offender.").  Plaintiff alleged that the defendants, while acting in furtherance of the conspiracy alleged in Counts I through IV, committed acts that amounted to mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.  *Cf. Lewis v. Fraunfelder*, 796 So. 2d 1067 (Ala. 2000).

[4] Doc. no. 4 (Motion to Dismiss With Prejudice filed Apr. 4, 2013).  *See also* doc. no. 5 (Motion to Dismiss With Prejudice filed Apr. 8, 2013), reading as follows:

Rismed Oncology Systems, Inc., Plaintiff in this action, Moves [*sic*] this honorable court to dismiss this action with prejudice.  Plaintiff seeks dismissal with

entered on April 9, 2013.[5]

## I. STANDARDS OF REVIEW

Federal Rule of Civil Procedure 60(b) permits a party or its legal representative to move for relief from a final judgment, order, or proceeding for, among other reasons: "(3) fraud . . . , misrepresentation, or misconduct by an opposing party; . . . or (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(3), (6).

To obtain relief under Rule 60(b)(3), the moving party must prove by clear and convincing evidence that "the adverse party obtained the verdict through fraud, misrepresentations, or other misconduct," and that "the conduct prevented [the moving party] from fully presenting his case." *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1309 (11th Cir. 2003) (alteration supplied) (citing *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000)).

Rule 60(b)(6), on the other hand, has been described by the Eleventh Circuit as "an extraordinary remedy," one that may be invoked "only upon a showing of exceptional circumstances." *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th

---

prejudice as a settlement has been reached in this action.

Consent has been obtained from the domestic parties all of whom have been served in this matter. The foreign parties have not stated a position with regard to the dismissal (Rismed Dialysis Systems, C.A. (Venezuela), Daniel Esgardo Rangel Baron, Isabel Rangel Baron).

[5] *See* doc. no. 6.

Cir. 1984) (citing *Ackerman v. United States*, 340 U.S. 193, 202 (1950)); *see also*, *e.g.*, *High v. Zant*, 916 F.2d 1507, 1509 (11th Cir. 1990) ("The law is well established that Rule 60(b)(6) affords relief from a final judgment only under extraordinary circumstances").   A party proceeding under that subdivision of the Rule has the burden of showing that "an 'extreme' and 'unexpected' hardship will result" if relief is not granted.   *Griffin*, 722 F.2d at 680 (alteration supplied) (citing *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932)).   Rule 60(b)(6) also is sometimes referred to as a "catchall provision," because it applies only to conduct that does not fall into any of the other categories listed in the first five clauses of the Rule.   *United States v. Real Property and Residence*, 920 F.2d 788, 791 (11th Cir. 1991); *see also, e.g., Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988) ("[C]lause (6) and clauses (1) through (5) are mutually exclusive.") (alteration supplied) (citing *Klapprott v. United States*, 335 U.S. 601, 613 (1949); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2864 (1973)).[6]

---

[6] The full text of Federal Rule of Civil Procedure 60(b) reads as follows:

(b) **Grounds for Relief from a Final Judgment, Order, or Proceeding**.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)   mistake, inadvertence, surprise, or excusable neglect;

(2)   newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

## II.  IMPORTANT PARTIES, PERSONS, AND ENTITIES

**RISMED**

Rismed Oncology Systems, Inc., an Alabama corporation with its principal place of business in Huntsville, Alabama.

**Jose A. Rodriguez**

Jose Alfredo Rodriguez incorporated RISMED and is its President.

**IVSS**

The "Instituto Venezolano de los Seguros Sociales," an entity of the Bolivarian Republic of Venezuela.

**Liliana Di Nardo Rodriguez**

The estranged wife of Jose Rodriguez.  She and defendant Daniel Esgardo Rangel-Baron are the biological parents of Daniel Rangel.  She filed for divorce in June of 2013, and moved back to Venezuela, allegedly to reunite with her first husband.

**Daniel Esgardo Rangel-Baron**

The first husband of Liliana Di Nardo Rodriguez, and the biological father of Daniel Rangel.  He resides in Venezuela, where he was employed from 1999 to 2006 as a salesman for RISMED.  He left that employment to start another company ("Continental") with his son, Daniel Rangel.

**Daniel Rangel**

The son of defendant Daniel Esgardo Rangel-Baron and Liliana Di Nardo Rodriguez, and the step-son of Jose Rodriguez (who reared Daniel from the age of thirteen). Daniel also has been known by such names as Daniel Alberto Rangel, Daniel R. Di Nardo,[7] and Daniel Alberto Rangel-

---

    (3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

    (4)     the judgment is void;

    (5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

    (6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

    [7] This is the name used by Daniel Rangel when incorporating and registering "Rismed Dyalysis Systems, Corp. (Florida)" in the State of Florida on July 17, 2008.

|                                              | DiNardo.[8]                                                                                                                                                                                  |
|----------------------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **Isabel Rangel-Baron**                      | The sister of Daniel Esgardo Rangel-Baron. She resides in Venezuela and allegedly was involved in the creation of "Rismed Dialysis Systems, C.A. (Venezuela)."                               |
| **Daniel Garlick**                           | A fundamentalist minister and "Christian Mediator" who was instrumental in the negotiation of the agreements discussed in Parts III(A) through (C) of this opinion, *infra*.                  |
| **Continental**                              | The company allegedly owned by Daniel Esgardo Rangel-Baron and his son, Daniel Rangel.                                                                                                       |
| **Rismed Dialysis Systems, Corp. (Alabama)** | An Alabama entity registered by Daniel Rangel with the Alabama Secretary of State on April 3, 2006.[9]                                                                                        |
| **Rismed Dialysis Systems, C.A. (Venezuela)**| An entity registered in Venezuela by defendants Daniel Esgardo Rangel-Baron (President) and his sister, Isabel Rangel-Baron (Vice President), on March 19, 2007.                              |
| **Rismed Dialysis Systems, Corp. (Florida)** | An entity incorporated and registered in Florida on July 17, 2008, by Daniel Rangel (using the name "Daniel R. Di Nardo"), and listing himself as President and Director.                     |
| **Campobasso, Inc.**                         | An Alabama corporation created by Jose Rodriguez and Liliana Di Nardo Rodriguez that owned 27 acres of farmland at 871 Dug Hill Road in Brownsboro, Alabama.                                  |
| **Campolieto, LLC**                          | An Alabama limited liability company created by Jose Rodriguez, Liliana Di Nardo Rodriguez, and Daniel Rangel that owned real estate located at 1220 Somerville Road, in Decatur, Alabama.    |
| **D.R. Properties II, LLC**                  | A limited liability company created by Daniel Rangel. The properties owned by Campobasso, Inc., and Campolieto, LLC, were sold to this entity by Liliana Di Nardo Rodriguez, allegedly for amounts far below market value. |

---

[8] This is the name used by Daniel Rangel when executing the Mar. 29, 2013 settlement agreement discussed in Part III(C) of this opinion, *infra*.

[9] *See* doc. no. 14 (Defendants' Opposition to Plaintiff's Motion for Relief), at 5 (affirming that Daniel Rangel "is an officer and shareholder in: Rismed AL and Rismed FL").

| | |
|---|---|
| **State Court Complaint** | An action filed on August 2, 2013 in the Circuit Court of Madison County, Ala. (Civil Action No. CV-13-901700) by RISMED, Campobasso, Inc., and Campolieto, LLC, and Jose Rodriguez (who sued both individually, and, in his representative capacities as President of RISMED, a shareholder of Campobasso, Inc., and a member of Campolieto, LLC) against "Daniel A. Rangel a/k/a Daniel Di Nardo, Liliana Rodriguez a/k/a Liliana Di Nardo, Daniel Garlick, and D.R. Properties II, LLC."[10] |

## III.  FACTUAL REPRESENTATIONS BY THE MOVANT

Rismed Oncology Systems, Inc. ("**RISMED**"), is an Alabama corporation that "supplies medical equipment to Latin America, principally Venuezuela."[11]  After learning that the Instituto Venezolano de los Seguros Sociales ("**IVSS**") — an agency of the Bolivarian Republic of Venezuela that provides dialysis services to the people of Venezuela — "was searching for a reliable distributor of medical dialysis supplies,"[12] RISMED's President, Jose A. Rodriguez, began negotiations to fill that need.  The following account of subsequent events is taken from the affidavit Jose Rodriguez submitted in support of the present motion:[13]

> 3.    From 1999 through 2004, I made several attempts to break into the dialysis business in Venezuela.  I procured dialysis-kit samples from several of my suppliers to send to the Venezuelan government.  After several meetings and several trial samples, my company, RISMED[,] was awarded an official contract with the

---

[10] *See* doc. no. 14-2 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "B").

[11] Doc. no. 1 (Complaint), ¶ 1.

[12] *Id.* ¶¶ 9-10.

[13] *See* doc. no. 7-1 ("**Rodriguez Affidavit**").

Instituto Venezolano de los Seguros Sociales ("IVSS") (i.e. Social Security Administration of Venezuela) with a plan to phase RISMED into being the sole supplier of dialysis products to the IVSS.

4. RISMED employee and salesman, Daniel Esgardo Rangel-Baron ("Rangel-Baron") was responsible for the sale of medical oncology equipment for RISMED in Venezuela, where he resided. Rangel-Baron had been successful as a salesman in oncology, thus I entrusted him with the additional responsibility to overlook the dialysis supply sales.

5. RISMED's contract with IVSS began through an initial Purchase Order ("P.O. 1540/6108") on June 7, 2004, for 351,780 dialysis kits. RISMED began supplying dialysis kits to the IVSS, and started receiving payments for the kits at the end of the first quarter in 2005.

6. On March 21, 2005, RISMED received its first payment from IVSS via wire transfer in the amount of $3,899,980.00 to its Regions Bank account in Huntsville, Alabama. A payment for $3,900,000.00 followed on June 10, 2005. The last payment of $5,919,400.00 was made on August 11, 2005, for a total amount of $13,719,380.00 for the initial Purchase Order.[14]

7. A second Purchase Order was initiated during the third quarter of 2005, again to be fulfilled by RISMED. Rangel-Baron began alleging a "postponement" by the Venezuelan government in providing a copy of the second Purchase Order. He then represented that the order was "being processed" with the order and funds expected to be provided to the RISMED bank account in Huntsville, Alabama, sometime during the fourth quarter of 2005.

---

[14] A later paragraph in this same affidavit states: "At the time of the first purchase order, RISMED was supplying 25% of the IVSS needs in dialysis. RISMED was promised a 100% contract by the time of the second purchase order. . . ." Rodriguez Affidavit ¶19.

8.  The payment from the second Purchase Order never arrived. Rangel-Baron advised me that the IVSS had "cancelled the contract" with RISMED, and that IVSS was in a new contract with Continental, a company opened and owned by Rangel-Baron.

9.  At all times representations were being made that the RISMED contract had been non-renewed, and that a valid agreement was in place for IVSS to deal solely with Rangel-Baron and Continental going forward.

10.  With the IVSS failing to fulfill an additional purchase order with RISMED, and Rangel-Baron suddenly finding great wealth, I reasonably believed that the RISMED contract had indeed been non-renewed and that IVSS intended to place new orders with Rangel-Baron's company, Continental.

11.  Rangel-Baron moved his biological son, Daniel Rangel, to Miami, Florida to "manage the Continental contract with IVSS." Daniel Rangel also began representing to me that he was working with his biological father at "Continental," and both Rangel-Baron and Daniel Rangel continued to represent that the IVSS had decided to go with their "father-son" operation through Continental.

12.  In May 2012, a friend of mine residing in Caracas, Venezuela mentioned to me that he had overheard Rangel-Baron represent that he was the owner of "RISMED," which my friend knew to be my company[.]

13.  I then began inquiring deeper into Rangel-Baron's business operations, and discovered that Rangel-Baron had opened a company named "RISMED Dialysis System, C.A., in Venezuela" on March 19, 2007, [*with himself*] as President, [*and*] with his sister, Isabel Rangel, as Vice-President.

14.  I have now learned that, in 2006, my stepson, Daniel Rangel, had

also opened a similarly named company in Alabama, "RISMED Dialysis Systems, Inc."  I of course realized this was near the same time the contract in Venezuela for RISMED had purportedly been cancelled or non-renewed.

15.    I also have now discovered that Rangel-Baron incorporated "RISMED Dialysis Systems Corporation" in Florida on July 17, 2008 under his son's name, Daniel Rangel, and yet another corporation in San Jose, Costa Rica under the name "RISMED Dialysis Systems Corporation, S.A.," with a partner by the name of Orlando Araya Amador.

16.    I learned in August 2012 that, in actuality, IVSS had continued to make purchase orders for the dialysis kits under the contract trade name "RISMED," and that Defendants had set up bank accounts in Miami[,] Florida, converting the RISMED funds to their benefit.

17.    It became apparent to me that "father and son" had opened separate businesses under the same name, RISMED, in order to steal the money for the planned purchase orders for the dialysis kits, which was supposed to go to my RISMED company, and all the while fraudulently representing to me that the Venezuelan government had awarded a contract to Continental.  The IVSS had been wiring funds to the sole title of "RISMED," so there was never an indication to any vendor or suppliers of a diversion or a fraud.

18.    Although the original contract with the IVSS was specifically with RISMED Oncology Systems, Inc., I used the trade name "RISMED Dialysis System" to distinguish my oncology line from my dialysis line.  I also used the name RISMED Dialysis Systems for the labeling of the RISMED dialysis products going to the IVSS.  Indeed, all of the vendors for RISMED were notified by me personally to use the name "RISMED Dialysis Systems" on the product labeling.  In fact, I created the artwork for the labels

myself, and forwarded it to each of my suppliers.[15]

The gravamen of the five claims alleged in the complaint subsequently filed by RISMED in this court is that the defendants had fraudulently diverted wire transfers of substantial sums paid by IVSS that should have been deposited into RISMED's Regions Bank account in Huntsville, Alabama.

Understandably, the suit strained the relationship between Jose Rodriguez and his step-son, Daniel A. Rangel, as well as the marital union between Jose and his wife (and Daniel's mother), Liliana Di Nardo Rodriguez.[16]  The complaint subsequently filed in state court by Jose Rodriguez and RISMED (among others) — an event that will be more fully described in Part III(F) of this opinion, *infra* — alleged that, during the month following the commencement of suit in *this* court, Daniel Rangel ("**Rangel**")

> reached out to Rodriguez and expressed interest in repairing their relationship and building new business partnerships.  Rangel invited Rodriguez to Hong Kong, a sentimental place where stepson and stepfather had spent lots of time together during the performance of the [RISMED] contract with the IVSS, texting Rodriguez "Jose estoy en Miami [*i.e.*, "*Jose, I am in Miami*"] and I have to go to HK next week para reunirme con Bain [*i.e.*, "*to meet with Bain*"].  Vamos? [*i.e.*, "*Want to go?*"]  Te compro ticket? [*i.e.*, "*I will buy the ticket*"]"  Rodriguez responded "Like

---

[15] Rodriguez Affidavit ¶¶ 3-18 (alterations supplied).

[16] *See* doc. no. 14-2 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "B": Complaint filed Aug. 2, 2013 in the Circuit Court of Madison County, Ala. as Civil Action No. CV-13-901700) ("**State Court Complaint**"), ¶ 28.

the old times, [but] this time I will keep my eyes open so you won't escape at night."

30. Soon thereafter, Rodriguez began receiving phone calls from [Daniel] Garlick, an evangelical minister whom both Rangel and Rodriguez knew and who held himself out as an impartial and experienced mediator of disputes who was "interested only in resolution." At the time, Rodriguez was in Venezuela; however, he agreed to have lunch with Garlick upon his return.

31. Unbeknownst to Rodriguez at this time was the fact that Rangel was paying or had agreed to pay Garlick significant sums of money, ostensibly to cover medical bills being incurred by a child of Garlick.

32. On or about March 25, 2013, Garlick had lunch with Rodriguez in Huntsville, Alabama.

33. At the lunch, Garlick attempted to persuade Rodriguez to drop the Federal Action. Garlick told Rodriguez that the Federal Action, was "outside of God's will" and would forever destroy Rodriguez's relationships with his step-son, step-daughter and wife. Garlick further stressed that the Federal Action was an impairment [sic] for Rodriguez's wife to come back home, [and] he added that should Rodriguez be successful in obtaining a judgment in the Federal Action "Daniel will end up in jail" because of Rangel's ownership interest in the defendant companies.

34. Garlick told Rodriguez to join him on a trip to Miami, Florida to meet and negotiate with Rangel. Garlick instructed Rodriguez that the meeting was to take place without attorneys.

35. Garlick and Rodriguez traveled to Miami and had multiple meetings with Rangel.

36. Following discussions on March 27, 2013, Rangel sent a message

12

to Rodriguez in which he expressed "I love you so much!  I feel so happy about all this."  In response, Rodriguez stated "Daniel, I feel like running on the street telling the world that I got my son back."

37. On March 28, 2013, Garlick, Rangel and Rodriguez met at the Rusty Pelican restaurant in Miami, Florida.  At the meeting, Rangel expressed to Rodriguez that he wanted to restore both their family and business relations.  Both Garlick and Rangel stressed to Rodriguez that "he wouldn't want to be responsible for sending his grandchildren's father to prison" and thus any agreement between the parties would have to include dismissal of the Federal Action.

38. Rangel and Rodriguez formed an agreement that would govern the parties' business relationship going forward.  In broad terms, Rangel agreed to make certain payments including to provide capital to Onco America, a company owned by Rodriguez which was not part of the Federal Action.  Rangel also agreed to provide to Rodriguez an ownership interest in his "Factory and Dialysis Business" and provide a salary to Rodriguez of at least $10,000 per month.

39. Rodriguez agreed to give Rangel an ownership interest in Onco America and dismiss the Federal Action.

40. Garlick, who is not an attorney, drafted the terms of the agreement which both Rangel and Rodriguez executed on March 28, 2013 (the "Miami Accords").[17]

## A.   The "Miami Accords"

The so-called "Miami Accords," as drafted by Daniel Garlick and executed by

Jose Rodriguez and Daniel Rangel on March 28, 2013 — with all of the document's

---

[17] State Court Complaint, ¶¶ 29-40 (alterations supplied).

grammatical, spelling, and punctuation errors — read as follows:

> As per our verbal agreements, following is a written form of the items we have agreed upon.
>
> 1. Court Case is Irrevocably Closed Documents Will be Drawn and Jose [Rodriguez] Will Sign deliver by Tuesday March 2, 2013 [*sic*: *undoubtedly*, April 2 *was intended*, *because the Accords were executed on* March 28.]
>
> 2. Jose Will Give Daniel Alberto [Rangel] an Ownership Position in Onco America Parent Company and The Oncology Business
>
> 3. Daniel Alberto Will Provide Capitol To Make Sure That Onco America Remains Solvent (250k-300k?), this money will take care of the new installation at Indio Mara and a final payment to the builder that built the bunker. OncoAmerica is solvent, has a large accounts receivable.
>
> 4. Daniel Alberto Will Provide To Jose An Ownership Position In The Factory And Dialysis Business
>
> 5. Jose And Daniel Alberto Will Work Together to Grow Both The Oncology Business And The Dialysis Business
>
> 6. Jose Will Receive Through His Work And Participation In The Dialysis Business In Addition To His Owners Share Of Profit Enough To Cover His Monthly Living And Business Expenses in The US (10,000.00 ?? per month)
>
> 7. A detail description of responsibilities will be developed to assure success for both the dialysis and the oncology business.
>
> 8. Any and all Agreements Made Will Have An Arbitration Clause
>
> Action Steps to be taken prior to next week's meeting

a.)   Jose will close court case Monday March 1, 2013 [*sic*]

b.)   We Will Meet Tuesday March 2, 2013 [*sic*] In Huntsville

c.)   Enhanced Communication among the parties

d.)   Work Out Details Of shared Ownerships (Percentages/Timeline etc.)[18]

In essence, the marginally-literate document provided that, in return for Jose Rodriguez's promise to dismiss the suit filed in this court with prejudice (*i.e.*, "Irrevocably Closed"), and, to "Give Daniel Alberto [Rangel] An Ownership Position" in the parent company of an entity identified only as "Onco America" and "The Oncology Business," Daniel Rangel promised (among other things) to provide Jose Rodriguez "An Ownership Position In The Factory and Dialysis Business" (*i.e.*, the sale of dialysis supplies to IVSS by "Continental" and the various domestic and Venezuelan Rismed corporations created and controlled by Daniel Rangel and his father and aunt).

## B.   Presentation of a Formal Settlement Agreement

In accordance with the act implied in the first numbered paragraph of the Miami Accords — *i.e.*, that formal "Documents Will be Drawn" to effect the parties' respective agreements, and that "Jose Will Sign deliver by Tuesday ~~March~~ [*sic*:

---

[18] *See* doc. no. 14-5 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "E") (alterations supplied).

15

*April*] 2, 2013" — Daniel Rangel presented a proposed "Confidential Settlement

Agreement and Mutual Release" to Jose Rodriguez on April 1, 2013. It contained no

reference to the Miami Accords.[19]   Jose Rodriguez expressed to both Rangel and

Garlick his "concern that the Settlement Agreement contained no reference to the

Miami Accords."[20]   The complaint filed in state court later that year (see Part III(F),

*infra*) outlined the events that occurred after Jose did so:

43. On April 2, 2013, while in Madison County, Alabama, Garlick expressed to Rodriguez that he strongly opposed the specifics of the Miami Accords being included in the Settlement Agreement. Garlick further expressed to Rodriguez that inclusion of the terms would be a source of future legal disputes and he should "trust his son."

44. Later on April 2, 2013, Rodriguez informed Rangel that he would be meeting with his attorney on the morning of April 3, 2013 to review the Settlement Agreement.

45. On the morning of April 3, 2013 Rangel sent to Rodriguez the following text messages:

1 Corinthians 13:4-7

Love is patient, love is kind.
It does not envy, it does not boast, it is not proud.
It is not rude, it is not self-serving, it is not easily angered, it keeps no record of wrongs.
Love does not delight in evil but rejoices with the truth.

---

[19] *See*, *e.g.*, State Court Complaint, ¶ 41.

[20] *Id*. ¶ 42.

It always protects, always trusts,
always hopes,
always perseveres.

I love you, thank you for putting everything aside
and helping me restore our relationship... Sorry for
hurting you, nunca fue mi intencion Jose [*i.e.*, "*it
was never my intention Jose*"], you are my dad an
[*sic*] I will never disappoint you again.

46. *On April 3, 2013, Rodriguez was advised by competent counsel
that he should not execute the Settlement Agreement without it
including reference to the Miami Accords.*

47. On April 3, 2013, while in Madison County, Alabama, Garlick
instructed Rodriguez to ignore his attorney's advice, that it was
"God's will" and that he should "trust in his son and be a good
father."[21]

## C. Signing the Settlement Agreement

Jose Rodriguez ignored his attorney's advice and signed the Settlement

Agreement on April 3, 2013.  He executed the document in both his individual and

representative capacities, as President of RISMED.  He and RISMED are collectively

referred to as either the "**RODRIGUEZ PARTIES**" or the "**RODRIGUEZ**

**RELEASED PARTIES.**"

Daniel Rangel also signed the agreement in his individual and representative

capacities, as President of Rismed Dialysis Systems, Corp. (Alabama), and Rismed

---

[21] State Court Complaint, ¶¶ 43-47 (alterations and emphasis supplied).

Dialysis Systems, Corp. (Florida).  Rangel is identified in the agreement as "Daniel Alberto Rangel Di Nardo."  He and the two Rismed defendants are referred to as either the "**DINARDO PARTIES**" or the "**DINARDO RELEASED PARTIES**."[22]

Daniel Rangel's payment of $10.00 to Jose Rodriguez (the stated consideration for the agreement) was witnessed by Daniel Garlick,[23] who had "remained with Rodriguez at nearly all times" during the first three days of April 2013, "until Rodriguez executed the Settlement Agreement."[24]

1.    **The release language**

**General Release**.  For and in consideration of one payment to **the RODRIGUEZ PARTIES** in the total sum of TEN AND NO/100 DOLLARS ($10.00) inclusive of attorneys' fees and costs, the receipt and sufficiency of which are hereby acknowledged and in consideration of the mutual release of the parties,

**THE RODRIGUEZ PARTIES**, on behalf of themselves and their heirs, executors, administrators, agents, attorneys, representatives, successors, assigns and any person subrogated to their rights, having any

---

[22] *See* doc. no. 14-1 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "A": "Confidential Settlement Agreement and Mutual Release"), at ECF 8-12.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[23] *Id*. at ECF 13.

[24] State Court Complaint, ¶ 48.

18

rights of representation by or through them, and/or claiming through them, hereby covenant not to sue, and release, acquit and forever discharge Rismed Dialysis Systems, Corp. (Alabama), Rismed Dialysis Systems, Corp. (Florida), Daniel Alberto Rangel Di Nardo . . . (collectively the "**DINARDO RELEASED PARTIES**") of and from:

> Any and all past, present or future claims, actions, causes of action, rights, damages, costs, losses, expenses, judgments, demands, obligations, interest and compensation, of every kind and nature whatsoever, known or unknown, foreseen or unforeseen, in law or in equity, including, but not limited to, any and all claims arising out of, involving or relating to:  (1) the business relationship between any of the **RODRIGUEZ PARTIES** and any of the **DINARDO PARTIES**; (2) contracts with the Instituto Venezolano de los Seguros Sociales ("IVSS"); (3) the supply of dialysis kits and other services performed for the IVSS; (4) use of the "Rismed" name; and (5) any claim which was or could have been asserted in the lawsuit styled *Rismed Oncology Systems, Inc. v. Rismed Dialsyis Systems, Corp. (Alabama) et al.*, United States District Court for the Northern District of Alabama, Civil Action No. 5:13-cv-310-CLS (the "Lawsuit").

**THE DINARDO PARTIES**, on behalf of themselves and their heirs, executors, administrators, agents, attorneys, representatives, successors, assigns and any person subrogated to their rights, having any rights of representation by or through them, and/or claiming through them, hereby covenant not to sue, and release, acquit and forever discharge Jose Rodriguez, Rismed Oncology Systems, Inc., . . . (collectively the "**RODRIGUEZ RELEASED PARTIES**") of and from:

> Any and all past, present or future claims, actions, causes of action, rights, damages, costs, losses, expenses, judgments, demands, obligations, interest and compensation, of every kind and nature whatsoever, known

19

or unknown, foreseen or unforeseen, in law or in equity, including, but not limited to, any and all claims arising out of, involving or relating to:  (1) the business relationship between any of the **RODRIGUEZ PARTIES** and any of the **DINARDO PARTIES**; (2) contracts with the Instituto Venezolano de los Seguros Sociales ("IVSS"); (3) the supply of dialysis kits and other services performed for the IVSS; (4) use of the "Rismed" name; and (5) any claim which was or could have been asserted in the lawsuit styled *Rismed Oncology Systems, Inc. v. Rismed Dialsyis Systems, Corp. (Alabama) et al.*, United States District Court for the Northern District of Alabama, Civil Action No. 5:13-cv-310-CLS (the "Lawsuit").

The **RODRIGUEZ PARTIES AND THE DINARDO PARTIES (together "RELEASORS")** acknowledge and agree that this Mutual Release is a general release of all released parties.

**RELEASORS** expressly waive and assume the risk of any and all claims for damages which exist as of this date, but of which the **RELEASORS** do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect **RELEASORS'** decision to enter into this Release.  The **RODRIGUEZ PARTIES** further agree that they have accepted payment of the sum specified herein along with the mutual release from the DINARDO PARTIES as a complete compromise of matters involving disputed issues of fact.[25]

## 2.    The merger clause

As previously noted, the Miami Accords were not explicitly referenced in the

Settlement Agreement, but they arguably were implicit in the following clause:

---

[25] *See* doc. no. 14-1 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "A": "Confidential Settlement Agreement and Mutual Release"), at ECF 2-4 (all emphasis in original, alterations supplied).

**Entire Agreement**.  This Settlement Agreement contains the entire agreement between the undersigned parties *and supercedes any other agreements and covenants*, whether written or oral, and the terms and conditions of this Settlement Agreement are contractual and not a mere recital.[26]

**3**.    **The "no representations" clause**

The Settlement Agreement also contained the following statement:

**No Representations by Released Parties**.   **RELEASORS** declare that no representation made by any employees, agents or attorneys of, any of the **RELEASED PARTIES**, if any, concerning the validity or merit of any claims has induced them to make this Settlement Agreement and that they are acting upon their own judgment, belief and knowledge of the nature of all claims or potential claims against the **RELEASED PARTIES** in making this Settlement Agreement.[27]

**4**.    **The advice of counsel clause**

Finally, the agreement contained a provision stating that each party had relied upon the advice of independent counsel:

**Advice of Counsel and Understanding of Release**. **RELEASORS** warrant and declare that they are acting only after securing the advice and consultation of legal counsel of their choice. **RELEASORS** further acknowledge that they are over eighteen (18) years of age and that they have carefully read this Settlement Agreement and fully understand and know the terms thereof, and sign the same voluntarily as their own free act *and upon recommendation of legal counsel of their choice*.   **RELEASORS** further warrant that this settlement agreement is not being made for any other reason than the

---

[26] *Id*. at ECF 6 (boldface and underscored emphasis in original, italicized emphasis supplied).

[27] *Id.* at ECF 6-7 (boldface and underscored emphasis in original).

consideration expressed in this Settlement Agreement.[28]

Of course, the statement emphasized by italics — *i.e.*, the representation that Jose Rodriguez had signed the agreement "upon recommendation of legal counsel of [his] choice" — was not true.  Jose Rodriguez acted contrary to the advice of his attorneys when executing the Settlement Agreement.[29]

### D.    Dismissal of the Federal Action

Jose Rodriguez caused his attorneys to file two motions to dismiss this action with prejudice:  the first on April 4, and the second on April 8, 2013.  The latter motion was identical to the former one, save for a paragraph stating that both domestic defendants consented to the dismissal, and that the foreign defendants had not stated a position.[30]   Indeed, service then had not been perfected on the three foreign defendants.

### E.    Events Following Dismissal of this Action

Daniel Rangel made several payments to Jose Rodriguez during the months of April and May, 2013, ostensibly in accordance with the promises referenced by the Miami Accords.  Even so, plaintiff alleges that Rangel did so only as a guise, to retain the trust of Jose Rodriguez until such time as he, Rangel, could successfully

---

[28] *Id*. at ECF 7 (boldface and underscored emphasis in original, italicized emphasis supplied).

[29] *See* State Court Complaint, ¶ 46.

[30] *See supra* note 4.

consummate fraudulent conveyances of the so-called "Campobasso" and "Campolieto" properties.[31] The complaint later filed in state court described events following dismissal of the present action in the following manner:

51.    Through the month of April and the start of May 2013, Rodriguez and Rangel continued to work on the joint business projects specified in the Miami Accords.

52.    On multiple occasions through April and the start of May 2013, Rangel reaffirmed his commitment to the Miami Accords both in words and deeds.

53.    On May 2, 2013[,] Rangel gave Rodriguez $32,000.00 as part of his commitment under the Miami Accords.

54.    On May 13, 2013, Rangel gave a $5,000 check to Rodriguez as part of his commitment under the Miami Accords.

55.    On May 17, 2013, Rangel wired $95,000.00 to Rodriguez as part of his commitment to under [*sic*] the Miami Accords.

56.    Through mid-May 2013 Rodriguez and Rangel continued to have Enhanced Communications as called for in the Miami Accords. Pursuant to this, and the continued promises of the joint business relationships in the Dialysis Business, [*sic*] On May 14, 2013 Rangel presented to Rodriguez a deed for his execution as well as two corporate resolutions.  The deed purportedly was  to transfer the Dug Hill Road Property [*i.e.*, *27 acres of farmland located at 871 Dug Hill Road, in Brownsboro, Alabama, the title to which was held by* "Campobasso, Inc.," *an Alabama corporation with two shareholders*: *Jose Rodriguez and his wife, Liliana DiNardo Rodriguez*] to D.R. Properties [*i.e.*, *D.R. Properties II, LLC: an Alabama limited liability company created by Daniel Rangel, its sole member*].   And the Corporate resolutions were to give

---

[31] Doc. no. 7 (Plaintiff's Motion for Relief), at 6.

permission to Liliana Di Nardo to make property transfers.

57. Unknown to Rodriguez was that the Dug Hill Road Property, along with the Decatur Property [*i.e.*, *family real estate located at 1220 Somerville Road in Decatur, Alabama, the title to which was held by* "Campolieto, LLC," *an Alabama limited liability company with three members: Jose Rodriguez, Liliana Di Nardo Rodriguez, and Daniel Rangel*], had already been transferred to D.R. Properties and the new papers were simply an attempt to paper over the fraud. Had Rodriguez known about the prior frauds or the intent of Rangel to not honor the Miami Accords, Rodriguez would not have executed the deed and corporate papers.

58. Also on May 14, 2013[,] Rangel presented Rodriguez a check for $30,000.00.

. . . .

60. There were insufficient funds in the account to cover the $30,000.00 check.

61. On May 23, 2013, Rangel promised to Rodriguez in a text message: "I will give you a new 30k check over the weekend, sorry about that."

62. To date, Rangel has not presented a new check or the $30,000.00 funds.

63. In May 2013, Rangel delivered to Rodriguez a Bentley [*i.e.*, *an English automobile*] that he owned that had been in a car accident, for which Rangel had no insurance. Rangel contracted with Rodriguez to repair the car.

64. Repairs were made to the vehicle totaling $6,990.58.

65. To date, Rangel has not paid for repairs to the vehicle.

66.   On or about June 7, 2013, Liliana Di Nardo filed a complaint for Divorce against Rodriguez [and returned to Venezuela[32]].

67.   Rangel has failed to make the payments or fulfill his other obligations indicated under the Miami Accords.  Rangel has ceased all communications with Rodriguez.[33]

Jose Rodriguez alleges that he did not learn of the sale of the Campobasso and Campolieto properties by Liliana Di Nardo Rodriguez to her son at a preferential, below-market-value price until July 9, 2013, when he drove by the Campobasso property on Dug Hill Road and noticed a "For Sale by Owner" sign listing the cellular telephone number of Daniel Rangel.[34]

F.   **The State Court Suit**

As a result of the foregoing events, a suit was filed in the Circuit Court of Madison County, Alabama, on August 23, 2013, by RISMED, Campobasso, Inc., Campolieto, LLC, and Jose Rodriguez (who sued both individually, and, in his representative capacities as President of RISMED, a shareholder of Campobasso, Inc., and a member of Campolieto, LLC).  The persons and entities sued in that action were an entirely different cast of characters from those named as defendants in the present action:  *i.e.*, the state court defendants were "Daniel A. Rangel a/k/a Daniel

---

[32] *See* doc. no. 7 (Plaintiff's Motion for Relief), at 8.

[33] State Court Complaint, ¶¶ 51-58, and 60-67 (alterations supplied).

[34] *See* doc. no. 7 (Plaintiff's Motion for Relief), at 8.

Di Nardo, Liliana Rodriguez a/k/a Liliana Di Nardo, Daniel Garlick, and D.R.

Properties II, LLC." Even though the claims alleged in the state court complaint were

based upon the same nucleus of operative facts discussed in the previous parts of this

opinion, they were entirely different from those that had been asserted in the present

action. Specifically, the state court complaint alleged the following claims:

| | |
|---|---|
| **Count I** | "Fraud and Misrepresentation by Rangel": *i.e.*, Daniel Rangel made false representations that induced Jose Rodriguez to dismiss the Federal Action, and to execute deeds and corporate resolutions concerning the Campobasso and Campolieto properties. |
| **Count II** | "Fraud and Misrepresentation by Garlick": *i.e.*, Daniel Garlick made false and misleading representations regarding his status as the parties' mediator and, thereby, caused Jose Rodriguez and RISMED to dismiss the Federal Action. |
| **Count III** | "Conspiracy": *i.e.*, defendants engaged in a malicious combination to defraud plaintiffs, and cause the dismissal of the Federal Action and the execution of papers concerning the Campobasso and Campolieto properties. |
| **Count IV** | "Breach of Contract (The Miami Accords)": *i.e.*, Daniel Rangel breached the Miami Accords by failing to make all payments required under the terms of that agreement. |
| **Count V** | "Breach of Contract (Bentley)": *i.e.*, Jose Rodriguez agreed to pay for the cost of repairs to an uninsured English Bentley automobile owned by Daniel Rangel that had been damaged in an accident, in return for Rangel's promise to reimburse him for the cost of the repairs, but Rangel breached the agreement. |

**Count VI**      "Breach of Fiduciary Duties":  *i.e.*, Liliana Di Nardo Rodriguez and Daniel Rangel breached the fiduciary duties owed to Campolieto and Campobasso when the properties owned by those entities were sold to Daniel Rangel's company, D.R. Properties II, LLC., for prices that were below market value.

**Count VII**     "Rescission of Property Transfers":  *i.e.*, plaintiffs sought rescission of the Campobasso and Campolieto transactions on the grounds of fraud.

**Count VIII**    "Violation of [Alabama Code] § 6-5-285":  *i.e.*, Daniel Rangel violated this statute when he tendered Jose Rodriguez a worthless check.[35]

**Count IX**      "Negligence":  *i.e.*, Garlick was negligent for failing to disclose his conflicts of interest during the mediation.

The state-court defendants moved to dismiss the foregoing claims.[36]  Their motion relied primarily upon the terms of the April 3, 2013 Settlement Agreement. After reviewing briefs and hearing oral argument, the state court judge dismissed the

---

[35] The statute cited provides that:

> The holder of a worthless check, draft, or order for the payment of money shall have a right of action against the person who unlawfully made, uttered or delivered the same to him or to his endorser; and such action may be maintained though there has been no prosecution, conviction, or acquittal of the defendant for his unlawful act.  Such action must be commenced within one year from the date of the unlawful act.  The plaintiff in such action may recover such damages, both punitive and compensatory, including a reasonable attorney fee, as the jury or court trying the case may assess.

Ala. Code § 6-5-285 (1975).

[36] *See* doc. no. 14-3 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "C": Motion to Dismiss filed Sept. 11, 2013 in the Cir. Ct. Mad. Co., Ala., Civil Action No. CV-13-901700) (hereafter, **State Motion to Dismiss**").

action, but did not state any reason for doing so in his single-paragraph Order.[37] Nevertheless, the dismissal was not appealed, and the time for filing an appeal in the state-court system lapsed on November 20, 2013.[38]  Two days later, RISMED filed the motion that is addressed in this opinion.

## IV.  DISCUSSION

The first issue that must be confronted is defendants' contention that, because RISMED voluntarily dismissed its complaint with prejudice, there is no "final judgment, order, or proceeding" within the meaning of Rule 60(b); and, therefore, this court lacks jurisdiction to adjudicate its Rule 60(b) motion.[39]

Federal Rule of Civil Procedure 41(a)(1) addresses the subject of voluntary dismissals by a plaintiff "without a court order," and it reads as follows:

> (A) *Without a Court Order*.  Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff may dismiss an action *without a court order* by filing:

---

[37] *See* doc. no. 14-4 (Defendants' Opposition to Plaintiff's Motion for Relief, Ex. "D": Order entered Oct. 9, 2013 in the Cir. Ct. Mad. Co., Ala., Civil Action No. CV-13-901700)  (providing "This matter came before the Court on a Motion to Dismiss filed by the above named Defendants. The Court heard arguments on said motion on October 3, 2013.  All parties were represented by and through their respective counsel.  After review of the pleadings, the arguments of counsel[,] and the applicable law[,] this Court finds that [the] motion is due to be and the same is hereby GRANTED.") (alterations supplied).

[38] *See* Ala. R. App. P. 4(a)(1) ("[T]he notice of appeal required by Rule 3 shall be filed with the clerk of the trial court within 42 days (6 weeks) of the date of the entry of the judgment or order. . . .") (alteration supplied); *see also* doc. no. 14 (Defendants' Opposition to Plaintiff's Motion for Relief), at 11 (same).

[39] *See* doc. no. 14 (Defendants' Opposition to Plaintiff's Motion for Relief), at 14-22.

(i)    *a notice of dismissal* before the opposing party serves either an answer or a motion for summary judgment; or

(ii)    *a stipulation of dismissal* signed by all parties who have appeared.

(B) *Effect*.  Unless the notice or stipulation states otherwise, the dismissal is without prejudice.  But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

Fed. R. Civ. P. 41(a)(1) (emphasis added to (i) and (ii), all other emphasis in original).

Sub-section (a)(2) of that same Rule addresses the circumstances under which a plaintiff's dismissal of an action requires the entry of a court order, and it reads as follows:

(2) *By Court Order*; *Effect*.  Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.  If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication.  Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2) (emphasis in original).  As the Sixth Circuit observed in *D.C. Electronics, Inc. v. Nartron Corp*., 511 F.2d 294, 296 (6th Cir. 1975), Rule 41(a)(2) "contemplates the exercise of judicial discretion and the issuance of a court order in response to a motion by plaintiff . . . ."

The facts of this case do not fit neatly into either sub-section (a)(1) or (a)(2) of

29

Rule 41.

Defendants focus upon the fact that both of plaintiff's motions to dismiss were filed before any of the defendants had served "either an answer or a motion for summary judgment"; and, for that reason, they argue that plaintiff's two *motions* to dismiss should, nevertheless, be construed as "notices of dismissal" under Rule 41(a)(1)(A)(i).  Indeed, the Eleventh Circuit has held that "[t]he fact that a notice of dismissal is styled 'motion to dismiss' rather than 'notice of dismissal' is without consequence."  *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990) (alteration supplied).  Even so, defendants' argument overlooks the fact that plaintiff's second motion to dismiss stated that:

> *Consent has been obtained from the domestic parties*[,] *all of whom have been served in this matter*.  The foreign parties have not stated a position with regard to the dismissal (Rismed Dialysis Systems, C.A. (Venezuela), Daniel Esgardo Rangel Baron, Isabel Rangel Baron) [*indeed, the foreign defendants had not then been served with process*].[40]

Thus, it might also be argued under those circumstances that plaintiff's second motion effectively amounted to *a stipulation for dismissal* under Rule 41(a)(1)(A)(ii).

*In either event*, defendants' point is that plaintiff's motions to dismiss its complaint with prejudice were "*effective immediately* upon the filing of a written

---

[40] Doc. no. 5 (emphasis and alterations supplied); *see also* note 4, *supra*.

30

notice of dismissal, *and no subsequent court order* [was] *required*."[41]  In that regard,

four Circuits — the Sixth, Seventh, Ninth, and Tenth — have held that the filing of

*a notice of dismissal* under Rule 41(a)(1)(A)(i) does not require court approval.[42]  In

like manner, two Circuits — the Third and Eighth — have held that the filing of *a*

*stipulation for dismissal* under Rule 41(a)(1)(A)(ii) "is effective immediately and

does not require judicial approval."[43]  Perhaps the point of all such decisions was best

stated by the former Fifth Circuit in a case discussing the effect of filing a *notice of*

---

[41] Doc. no. 14 (Defendants' Opposition to Plaintiff's Motion for Relief), at 18 (quoting *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990) (emphasis and alteration supplied, citation omitted).

[42] *See Merit Insurance Co. v. Leatherby Insurance Co.*, 581 F.2d 137, 141 (7th Cir. 1978) (observing that the predecessor to the present Rule "'is clear and unambiguous on its face and admits of no exceptions that call for the exercise of judicial discretion by any court'") (quoting *D.C. Electronics, Inc. v. Nartron Corp.*, 511 F.2d 294, 298 (6th Cir. 1975) (observing, *id.* at 296, that the predecessor to the present Rule "provides for dismissal of an action upon the unilateral filing of a notice of dismissal with the Clerk of Court and *without the necessity of* . . . [an] *order of the court*") (ellipses and alteration supplied).  *See also*, *e.g.*, *Scam Instrument Corp. v. Control Data Corp.*, 458 F.2d 885, 888 (7th Cir. 1972) (holding that the filing of a notice of dismissal "automatically terminated the action upon the filing of the dismissal with the clerk.  *No order of court was required.*") (citing *Miller v. Reddin*, 422 F.2d 1264, 1266 (9th Cir. 1970) (same)); *Hyde Construction Company v. Koehring Company*, 388 F.2d 501, 507 (10th Cir. 1968) ("The purpose of that rule is to provide a means for terminating an action automatically by filing with the clerk a notice of dismissal.  *That notice closes the file*; *no order of the court is needed*.") (emphasis supplied, citation omitted).

[43] *United States v. Altman*, 750 F.2d 684, 696-97 (8th Cir. 1984) (quoting *Gardiner v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1189 (8th Cir. 1984)).  *See also First National Bank of Toms River, N.J. v. Marine City, Inc.*, 411 F.2d 674, 677 (3d Cir. 1969) (same); 130 F.2d 185, 186 (3d Cir. 1942) (observing that "the parties themselves may by stipulation . . . dismiss the action"); *Ajiwoju v. Cottrell*, 245 F. App'x 563, 564, 2007 WL 2323972, at *1 (8th Cir. 2007) (*per curiam*) ("A voluntary dismissal pursuant to Rule 41(a)(1) is effective upon entry and does not require judicial approval.") (citing *Gardiner*, *supra*); *Scher v. Ashcroft*, 960 F.2d 1053 (Table), 1992 WL 83547, at *1 (8th Cir. 1992) (*per curiam*) ("A voluntary dismissal by stipulation under Rule 41(a)(1)(ii) . . . is effected without order of court. . . .") (citing *Altman*, *supra*).

*dismissal* under the predecessor to present Rule 41(a)(1)(A)(i).  According to the panel in *American Cyanamid Co. v. McGhee*, 317 F.2d 295 (5th Cir. 1963), that Rule

> is the shortest and surest route to abort a complaint when it is applicable. So long as [the] plaintiff has not been served with his adversary's answer or motion for summary judgment he need do no more than file a notice of dismissal with the Clerk. *That document itself closes the file*. There is nothing the defendant can do to fan the ashes of that action into life *and the court has no role to play*.  This is a matter of right running to the plaintiff and [it] may not be extinguished or circumscribed by adversary or court.  There is not even a perfunctory order of court closing the file.  *Its alpha and omega was the doing of the plaintiff alone*. . . .

*Id*. at 297 (alterations and emphasis supplied).

Based upon such rulings, defendants argue that RISMED's voluntary dismissal of its complaint with prejudice did not constitute a "final judgment, order, or proceeding" within the meaning of Rule 60(b); and, therefore, that this court lacks jurisdiction to adjudicate plaintiff's motion for relief.

The only cases that support defendants' bottom line, however, are two Eighth Circuit opinions that addressed the effect of voluntary dismissals by stipulation under the predecessor to present Rule 41(a)(1)(A)(ii).  *Ajiwoju v. Cottrell*, 245 F. App'x 563, 565 (8th Cir. 2007) (*per curiam*); *Scher v. Ashcroft*, 960 F.2d 1053 (Table), 1992 WL 83547 (8th Cir. 1992) (*per curiam*).  Both cases held that, because a dismissal by stipulation "is effected without court order, 'there is no final order or judgment from

which a party may seek relief under Rule 60(b).'" *Ajiwoju*, 245 F. App'x at 565 (quoting *Scher*, 1992 WL 83547, at *1). Notably, however, neither *Ajiwoju* nor *Scher* was published. Hence, the opinions do not possess binding authority in even the Circuit of their origin.

In contrast, plaintiff focuses upon the terms "final" and "proceeding" in Rule 60(b)'s prefatory paragraph,[44] and asks this court to follow the rationale of the Fifth Circuit's opinion in *Yesh Music v. Lakewood Church*, 727 F.3d 356 (5th Cir. 2013), and hold that a voluntary dismissal by either notice or stipulation is "a *final . . . proceeding*" for purposes of that Rule. The *Yesh Music* Court held that a plain reading of the term "final" supports defining it as something that is practically "finished," "closed," or "completed." *Id.* at 360 (citing *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152 (1964) ("[T]he requirement of finality is to be given a 'practical rather than a technical construction.'") (alteration supplied)). Thus, the *Yesh Music* Court held that, "unless a plaintiff acts to re-file her claim in the future, a Rule 41(a)(1)(A) voluntary dismissal terminates, closes, and ends her cause of action, and, therefore, can rightly be considered 'final.'" *Id.* (citing *Devino v. Duncan*, 215 F. Supp. 2d 414, 417 (S.D. N.Y. 2002)).

---

[44] "On motion and just terms, the court may relieve a party or its legal representative from a *final* judgment, order, or *proceeding* for the following reasons: . . . ." Fed. R. Civ. P. 60(b) (emphasis supplied).

> While [the terms] judgments and orders might imply the involvement of
> a judicial action, a "proceeding" does not necessarily require any such
> action.  Rather, "[t]he term 'proceeding' is indeterminate," *and may be
> used to describe* the entire course of a cause of action or *any act or step
> taken in the cause by either party*.  *See Reid v. Angelone*, 369 F.3d 363,
> 368 (4th Cir. 2004).

*Yesh Music*, 727 F.3d at 360 (first alteration and emphasis supplied, second alteration

in original).

Plaintiff also asserts that "the great weight of caselaw from other circuits

supports the conclusion that a dismissal, either with or without prejudice, is

considered a 'final' proceeding for purposes of Rule 60(b),"[45] and cites decisions

from five circuits holding that a voluntary dismissal is a "final proceeding" for

purposes of Rule 60(b).[46]

Even though it does not appear that the Eleventh Circuit has decided the

precise issue argued by the defendants, the panel that decided *State Treasurer of the*

---

[45] Doc. no. 17 (Brief in Support of Plaintiff's Motion for Relief), at 31.

[46] *Id.* at 31-36.  *See Nelson v. Napolitano*, 657 F.3d 586, 589 (7th Cir. 2011) ("We agree that there may be instances where a district court may grant relief under Rule 60(b) to a plaintiff who has voluntarily dismissed the action."); *In re Hunter*, 66 F.3d 1002, 1004-05 (9th Cir. 1995) (holding that a voluntary dismissal "is a judgment, order, or proceeding from which Rule 60(b) relief can be granted"); *Smith v. Phillips*, 881 F.2d 902, 904 (10th Cir. 1989) ("'[A]n unconditional dismissal terminates federal jurisdiction except for the limited purpose of reopening and setting aside the judgment of dismissal within the scope allowed by [Fed. R. Civ. P.] 60(b).'") (first alteration supplied, second alteration in original) (quoting *McCall-Bey v. Franzen*, 777 F.2d 1178, 1185 (7th Cir. 1985)); *Fairfax Countywide Citizens Association v. Fairfax County, Virginia*, 571 F.2d 1299, 1302-03 (4th Cir. 1978) (holding that the court retains the ability to vacate a Rule 41(a)(1)(A)(ii) stipulated dismissal under Rule 60(b)(6)); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976) (same).

*State of Michigan v. Barry*, 168 F.3d 8 (11th Cir. 1999), addressed the analogous question of whether there had been a "final decision" in a case in which the district court had entered partial summary judgment on some claims, and the parties had agreed ("stipulated") to a dismissal of the remaining claim without prejudice, in order to confer appellate jurisdiction under 28 U.S.C. § 1291. Among other issues discussed in the *Barry* opinion, the Court observed that "a Rule 41 voluntary dismissal without prejudice *is* a final decision." *Id*. at 18 (emphasis in original).

Based upon the analogous opinion in *Barry*, the number of circuits holding contrary to defendants' position, and the superior rationale of those decisions, this court predicts that the Eleventh Circuit will, when squarely faced with the same issue, adopt the majority position and hold that a Rule 41(a)(1)(A) voluntary dismissal by a plaintiff constitutes a "final order, judgment, or proceeding" for purposes of Rule 60(b).[47]

Accordingly, this court concludes that it does possess subject matter jurisdiction to address plaintiff's motion for relief from judgment.

**A.    The Timeliness of Plaintiff's Assertion of the Subject Motion**

"A motion under Rule 60(b) must be made within a reasonable time — and for

---

[47] Due to this holding, it is not necessary to address plaintiff's alternative arguments: *i.e.*, the motions to dismiss were only *requests* for the court to enter an order dismissing the case, and not *notices* of dismissal; and, the court's order of dismissal amounted to a consent decree that may be reviewed as a final order. *See* doc. no. 17 (Reply Brief in Support of Motion for Relief), at 38-40.

reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). This action was dismissed in April 2013, and plaintiff's motion to set aside the order of dismissal was filed seven and a half months later, on November 22, 2013. Hence, it is timely.

**B**.   **Plaintiff's Standing to Assert the Motion**

Defendants argue that the misrepresentations alleged as the inducement for Jose Rodriguez's execution of the Settlement Agreement and subsequent dismissal of this action were — even if they occurred — not directed to the plaintiff, RISMED, but to Jose Rodriguez, a nonparty.

Even so, "a nonparty may seek relief from a judgment procured by fraud if the nonparty's interests are directly affected." *Eyak Native Village v. Exxon Corp.*, 25 F.3d 773, 777 (9th Cir. 1994) (citing *Kem Manufacturing Corp. v. Wilder*, 817 F.2d 1517, 1521 (11th Cir. 1987)).[48] Several courts also have allowed relief where the moving nonparty was in some form of privity with a party to the prior proceeding. *See Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013) (citing *Eyak*

---

[48] Several courts also have allowed a nonparty to seek relief under Rule 60(b) where the nonparty's interests were directly or strongly affected by the judgment. *See Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013) (citing *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 188-89 (2d Cir. 2006); *Binker v. Pennsylvania*, 977 F.2d 738, 745 (3d Cir. 1992); *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1051-52 (2d Cir. 1982)). *See also In re Lawrence*, 293 F.3d 615, 627 n.11 (2d Cir. 2002) (noting that "several circuit courts have permitted a non-party to bring a Rule 60(b) motion or a direct appeal when its interests are strongly affected, and we have permitted such a motion on at least one occasion").

*Native Village*, 25 F.3d at 777).  Fundamentally, however, Rule 60(b) explicitly permits a court to "relieve a party *or* [its] *legal representative* from a final judgment, order or proceeding."  Fed. R. Civ. P. 60(b) (alteration and emphasis supplied).  As the Eleventh Circuit has observed,

> [t]he cases make clear that the term *legal representative* was intended to reach only those individuals who were in a position tantamount to that of a party[,] or whose legal rights were otherwise so intimately bound up with the parties that their rights were directly affected by the final judgment.

*Kem Manufacturing*, 817 F.2d at 1520 (alterations and emphasis supplied) (citing *Dunlop v. Pan American World Airways, Inc.,* 672 F.2d 1044, 1052 (2d Cir. 1982); *Western Steel Erection Co. v. United States*, 424 F.2d 737, 739 (10th Cir. 1970); *Mobay Chemicals Co. v. Hudson Foam Plastics Corp.*, 277 F. Supp. 413, 416 (S.D. N.Y. 1967)).

Jose Rodriguez incorporated RISMED, and he is its President.  His legal rights were inextricably entwined with RISMED's rights under the IVSS dialysis supply contract.  He was directly affected by the dismissal of RISMED's complaint.  Accordingly, Jose Rodriguez possesses standing to raise on behalf of RISMED a Rule 60(b) challenge to this court's order.

**C**.  **Rule 60(b)(3)**

　　**1**.  *Fraud "by an opposing party"*

37

Defendants next contend that plaintiff cannot satisfy Rule 60(b)(3)'s requirement for a movant to show that the order dismissing all claims was obtained through fraud, misrepresentation, or other misconduct "by an opposing party." Defendants focus upon the fact that the frauds, misrepresentations, and misconduct alleged by plaintiff were, even if they occurred, committed by non-parties, Daniel Rangel and Daniel Garlick.   That argument is not persuasive.   Daniel Rangel incorporated Rismed Dialysis Systems, Corp. (Alabama), and registered it with the Alabama Secretary of State.   He also was named as the incorporator of Rismed Dialysis Systems, Corp. (Florida).   He is President of both corporations.   Both of those corporate entities *were* parties to this action.   "When a corporation is involved, of course, it may act only through people as its [officers, agents, servants, attorneys, or] employees; and, in general, a corporation is responsible under the law for the acts and statements of its [officers, agents, servants, attorneys, or] employees that are made within the scope of their duties as [officers, agents, servants, attorneys, or] employees of the company."[49]   Both of the domestic Rismed defendants were controlled by Daniel Rangel, and both were instrumental to the diversion of IVSS funds that should have been deposited to RISMED's Regions Bank account in Huntsville, Alabama.   Furthermore, Daniel Garlick allegedly was not a neutral party,

---

[49] ELEVENTH CIRCUIT CIVIL PATTERN JURY INSTRUCTIONS, *Basic Instruction* No. 3.2.2 (2013) (alterations supplied).

but acted on behalf of Daniel Rangel, who either "was paying or had agreed to pay Garlick significant sums of money, ostensibly to cover medical bills being incurred by a child of Garlick."[50]  It is Black Letter law that "[a] principal is liable for the fraud of its agent, committed in the course of his employment, where others rely on the fraudulent misrepresentations to their detriment."[51]   Thus, any fraud or misrepresentation by Daniel Rangel and Daniel Garlick is attributable to "opposing parties."

**2**.   *The reasonableness of reliance*

Alabama law is clear that a party claiming to have been induced to commit a detrimental act by a fraudulent misrepresentation must establish, in addition to the other elements of a *prima facie* case,[52] that his reliance upon the falsehood was reasonable when viewed in the light of all of the facts and circumstances surrounding the transaction in question.  The Alabama Supreme Court framed the standard as follows in *Torres v. State Farm & Casualty Co*., 438 So. 2d 757 (Ala. 1983):

> Because it is the policy of courts not only to discourage fraud[,] but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the

---

[50] State Court Complaint, ¶ 31.

[51] *Arkel Land Co. v. Cagle*, 445 So. 2d 858, 862 (Ala. 1984) (*per curiam*) (alteration supplied) (citations omitted).

[52] *See generally* ALABAMA PATTERN JURY INSTRUCTIONS – CIVIL § 18.01 (Intentional False Statement) (3d ed. 2013); Jenelle Mims Marsh, ALABAMA LAW OF DAMAGES § 36:32, at 902-03 (6th ed. 2012).

plaintiffs to exercise some measure of precaution to safeguard their interests.  In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.  *Bedwell Lumber Co. v. T & T Corporation*, 386 So. 2d 413, 415 (Ala. 1980).

> "If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "*volunti* [*sic*] *non fit injuria*" [*i.e.*, a person who knowingly and voluntarily risks danger cannot recover for any resulting injury].

*Munroe v. Pritchett*, 16 Ala. 785, 789 (1849).

*Torres*, 438 So. 2d at 758–59 (alterations supplied, footnote omitted).[53]

Among other considerations, the "reasonable reliance" standard imposes upon a plaintiff a "general duty . . . *to read* the documents received in connection with a particular transaction."  *Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997) (overruling *Hickox v. Stover*, 551 So. 2d 259 (Ala. 1989), the case that established the so-called "justifiable reliance" standard under which a plaintiff in a fraud action was required to prove only that he or she had "justifiably relied" on the defendant's misrepresentations, even if the plaintiff had been in possession of

---

[53] The omitted footnote observed that the Latin maxim recited in the quote from *Monroe v. Pritchett* is correctly spelled "*volenti non fit injuria*," and defined it as standing for "[t]he principle that a person who knowingly and voluntarily risks danger cannot recover for any resulting injury." *Torres*, 438 So. 2d at 759 n.3 (quoting Black's Law Dictionary 1605 (8th ed. 2004)).

documents that, *if the plaintiff had read them*, were inconsistent with the statements on which the plaintiff alleged that he relied, and replacing *Hickox* with the "reasonable reliance" standard represented by cases such as *Foremost* and *Torres*, *supra*).

Thus, under the "reasonable reliance" standard, a person has no right to "blindly rely on an agent's oral representations or silence to the exclusion of written disclosures in a policy" or other documents received in connection with a transaction. *Ex parte Carver*, 742 So. 2d. 168, 172-73 (Ala. 1999).  Indeed,

> [w]hen reviewing a plaintiff's actions pursuant to the reasonable-reliance standard, [the Alabama Supreme] Court has consistently held that a plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents. . . .

*AmerUS Life Insurance Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008) (alterations supplied).

Here, Jose Rodriguez read the "Confidential Settlement Agreement and Mutual Release" presented to him on April 1, 2013, and noted the omission of any reference to the mutual promises contained in the "Miami Accords."  He not only expressed his "concern" over that omission to Daniel Rangel and Daniel Garlick, but took the draft agreement to the attorneys who had filed the present action.  He was advised by those

attorneys to "not execute the Settlement Agreement without it including reference to the Miami Accords."[54]  He, nevertheless, ignored the advice of counsel, executed the agreement, and subsequently directed his attorneys to file motions to dismiss this action with prejudice.  There is no evidence that Jose Rodriguez then was unable to comprehend words written and spoken in the English language, or that he suffered from any infirmity that affected his comprehension of the documents that precipitate the dismissal of this action.  Indeed, all evidence tends to show that Mr. Rodriguez was an experienced businessman.

It clearly appears that Jose Rodriguez was motivated to reach a settlement of the claims asserted in this action by a combination of considerations:  appeals based upon his familial love and affection to heal the discord within his family; entreaties to spare his step-son from a criminal prosecution for wire fraud; and, appeals to his deeply religious nature.  Even so, Mr. Rodriguez failed to exercise a reasonable degree of caution to safeguard his own, and RISMED's, interests.  Instead, he ignored the advice of counsel, and blindly trusted oral advice to "trust his son" to fulfill the promises contained in the Miami Accords when the typewritten text of the Settlement Agreement explicitly stated that it superceded "any other agreements and

---

[54] State Court Complaint, ¶ 46.

covenants."[55]   In short, Jose Rodriguez closed his eyes where ordinary diligence required him to see, and he thereby was willingly deceived.  *See Torres*, 438 So. 2d at 758–59.  As the Alabama Supreme Court observed long ago, the maxim *volenti non fit injuria* applies.  *Munroe v. Pritchett*, 16 Ala. at 789.

**D**.    **Rule 60(b)(6)**

Plaintiff makes three arguments for setting aside the dismissal of this action on the basis of Rule 60(b)(6):   Jose Rodriguez executed the Miami Accords and Settlement Agreement without knowledge that his wife already had executed deeds in an attempt to transfer title to the Campobasso and Campolieto properties to her son's company, D.R. Properties II, LLC, at preferential, below-market-value prices; Jose Rodriguez subsequently executed "Unanimous Written Consents" to complete the transfer of title to those properties (and a quitclaim deed for the Campobasso property) as part of the resolution of this case, without knowledge that those properties "had already been fraudulently transferred";[56] and, defendants attempted to "cover up" the fraudulent transfers through "backdated documents."

As defendants note, however, neither the complaint filed in this action, nor the two agreements that precipitated plaintiff's motions to dismiss, referred to the

---

[55] Doc. no. 14-1 (Exhibit "A" to Defendants' Opposition to Plaintiff's Motion for Relief: "Confidential Settlement Agreement and Mutual Release"), at ECF 6.

[56] Doc. no. 7 (Motion to Set Aside Order of Dismissal), at 6.

43

Campobasso and Campolieto properties.  Instead, both properties were "part of an unrelated and isolated transaction."[57]  Further, the veracity of Jose Rodriguez's allegation that, on the dates he signed the Miami Accords (March 28, 2013) and the Settlement Agreement (April 3, 2013), he knew nothing about his wife's prior attempts to transfer the properties to her son's company is undermined by his act of recording on March 7, 2013 — *i.e.*, prior to either agreement — a deed purporting to transfer title to the Campobasso property to himself.[58]

Fundamentally, however, plaintiff's arguments pertaining to the Campobasso and Campolieto properties hinge on contentions of fraud and deceit by his estranged wife and step-son, or by the attorneys who represented them.  Therefore, such arguments are misplaced as a basis for affording relief under Rule 60(b)(6).  As explained in Part I of this opinion, that portion of the Rule applies only to conduct that does not fit within the first five clauses of Rule 60(b).  *See*, *e.g.*, *United States v. Real Property and Residence*, 920 F.2d 788, 791 (11th Cir. 1991) (observing that Rule 60(b)(6) "applies only to cases that do not fall into any of the other categories listed in parts (1)-(5) of Rule 60(b)"); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988) ("[C]lause (6) and clauses (1) through (5) are mutually

---

[57] Doc. no. 21 (Defendants' Sur-Reply), at 8.

[58] *Id.* ¶ 12; *see also* doc. no. 21-5 (Ex. "C").

exclusive.") (alteration supplied).[59]

## V.  CONCLUSION AND ORDER

It is a gross understatement to say that the conclusions of law recorded in this opinion are not satisfying.  The deceits practiced upon Jose A. Rodriguez by his wife and step-son (aided by their agents, Daniel Garlick, Daniel Esgardo Rangel-Baron, and attorneys) are far more than simply reprehensible.  Some of their actions, such as the diversion of wire transfers of funds that should have been deposited into plaintiff's Alabama bank account, are probably criminal.

Ultimately, however, RISMED must be denied relief under Federal Rule of Civil Procedure 60(b) because its President, Jose Rodriguez, has not demonstrated that his reliance on the frauds that led him to dismiss this action with prejudice was reasonable under the circumstances.

Plaintiff's motion for relief from judgment is DENIED.[60]

**DONE** and **ORDERED** this 7th day of March, 2014.

_____

United States District Judge

---

[59] *See supra* note 6 for the text of Fed. R. Civ. P. 60(b).

[60] Due to this holding, it is not necessary to address defendants' alternative arguments.

45