FILED
2015 Aug-18  AM 08:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14–15567
Non-Argument Calendar

_____

D.C. Docket No. 5:13–cv–00310–CLS

RISMED ONCOLOGY SYSTEMS, INC.,

Plaintiff-Appellant,

versus

DANIEL ESGARDO RANGEL BARON, *et al.*,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 17, 2015)

Before JORDAN, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

This appeal arises from frauds allegedly committed by Defendants, and comes to us following the district court's denial of Plaintiff's motions for relief from the voluntary dismissal of its complaint.  Upon review of the record and the parties' briefs, we **AFFIRM** for the reasons set forth below.

## I.    BACKGROUND[1]

After spending a decade working on the Space Shuttle program in Huntsville, Alabama, thermodynamics engineer José A. Rodriguez ("Rodriguez") decided he wanted to pursue a long-held interest in business.  So in 1990, at the urging of a friend, Rodriguez formed and incorporated Rismed Oncology Systems, Inc. ("Rismed Oncology" or "Rismed") to "suppl[y] medical equipment to Latin America, principally Venezuela."

A number of years later, sensing a demand from his customers for dialysis supplies, Rodriguez developed an expertise in the area and "began marketing dialysis sales through" Rismed Oncology.  Over a five year span, from 1999 to 2004, Rodriguez made "several attempts to break into the dialysis business in Venezuela[,]" with the ultimate aim of becoming the sole supplier of dialysis products to the Instituto Venezolano de los Seguros Sociales ("IVSS")—the Venezuelan equivalent of the United States Social Security Administration.  He

---

[1]  The following facts are taken from Plaintiff's Complaint and Motion to Set Aside the District Court's Order of Dismissal.  We assume them to be true for purposes of our review here.

eventually found success:  IVSS placed an order with Rismed Oncology for over 350,000 dialysis kits, paying the corporation $13.7 million between March and August 2005.  Sales representative Daniel Esgardo Rangel Baron ("Rangel Baron")—the biological father of Rodriguez's stepson, the ex-husband of his wife, and a resident of Caracas—was put in charge of the account.

IVSS appeared satisfied with Rismed Oncology, as it placed a second order with the corporation, this time representing 100% of its dialysis supplies needs.[2] But sometime in late 2005 and early 2006, Rangel Baron made a series of troubling representations to Rodriguez about the order: first, that the Venezuelan government was postponing it; second, that it "was 'being processed'" and should arrive "sometime during the fourth quarter of 2005"; and finally, that it had been cancelled.  Rather than proceed with Rismed, Rangel Baron informed Rodriguez that IVSS had decided to award the purchase order to "Continental"—a medical supply company that Rangel Baron had allegedly formed with his biological son, Daniel Alberto Rangel Di Nardo ("Daniel Rangel"), whom Rodriguez had raised since Daniel was thirteen.

Or so Rangel Baron said.  What actually happened, Rodriguez learned, was that Rangel Baron directed the incorporation of a number of companies in a number of locations, all called Rismed Dialysis Systems, Inc.  Specifically, Rangel

---

[2] The initial order represented 25% of IVSS's dialysis supplies needs.

Baron and his sister, Isabel Rangel Baron, incorporated a Rismed Dialysis Systems

in Venezuela ("Rismed Dialysis Venezuela"); Daniel Rangel incorporated a

Rismed Dialysis Systems in Alabama ("Rismed Dialysis Alabama"); Rangel

Baron, under Daniel Rangel's name, incorporated a Rismed Dialysis Systems in

Florida ("Rismed Dialysis Florida"); and Rangel Baron and partner Orlando Araya

Amador incorporated a Rismed Dialysis Systems in San Jose, Costa Rica ("Rismed

Costa Rica").

The ramifications of Rangel Baron's creation of these Rismed Dialysis

companies is two-fold.  First, while Rodriguez had incorporated his company as

Rismed Oncology and operated its oncology business under that name, he actually

conducted Rismed's dialysis business under the trade name "Rismed Dialysis

Systems."  This trade name was emblazoned on all of Rismed's dialysis products,

and it was the name by which Rismed's vendors knew the company.  Second,

when IVSS paid an invoice to Rismed Oncology, it simply made the payment out

to "Rismed."[3]

Given the above, it should come as no surprise that IVSS never cancelled its

second order for dialysis supplies from Rismed Oncology, but "continued to make

purchase orders for the dialysis kits under the contract trade name 'RISMED,'" and

did so through at least February 2013.  In short, if Plaintiff's allegations are

---

[3]  To pay invoices, IVSS would wire the funds to Rismed's bank account in Alabama.

accurate, Rangel Baron orchestrated a scheme whereby he usurped Rismed Oncology's contract with IVSS by utilizing the same products, supplies, and company name that had for years been used by Rismed.  Rangel Baron concealed this scheme from Rodriguez and explained his new-found wealth by claiming that IVSS had cancelled its contract with Rismed Oncology and had awarded it instead to his father-son corporation, Continental.  Rangel Baron fooled IVSS by convincing it to change the routing numbers for bank accounts to which it wired payments to those he established in connection with each Rismed Dialysis company he had formed.  (He had previously failed to persuade IVSS to change the name of the contract award from Rismed Oncology to Continental.)  And he pulled the wool over the eyes of Rismed's vendors by incorporating his companies under Rismed's trade name.

Thus, to the outside world it seemed that the only thing different about IVSS's subsequent orders was the routing information for payments.  But really, Rangel Baron had siphoned away roughly $50 million worth of business from Rismed Oncology and Rodriguez:  his employer and the man who had raised his son.

Rodriguez learned of Rangel Baron's scheme in July 2012 and when seven months of "efforts to avoid a lawsuit" failed, he filed suit in the Northern District of Alabama on behalf of Rismed Oncology.  The complaint alleged three federal

RICO claims and two state law fraud claims against Rangel Baron; Isabel Rangel

Baron; Rismed Dialysis Venezuela (the "Foreign Defendants"); and Rismed

Dialysis Alabama and Rismed Dialysis Florida (the "Domestic Defendants").

Almost immediately after Rodriguez filed the lawsuit, he was contacted by a

minister, Daniel Garlick ("Garlick"), with whom he and Daniel Rangel were close.

Garlick impressed upon Rodriguez that litigation would be a treacherous path,

detrimental to his family and faith, and that instead he should engage in Christian

mediation with Daniel Rangel to work through the dispute.  Rodriguez agreed, and

he and Garlick traveled to Miami to "resolve the lawsuit and the underlying

disagreements."

With Garlick acting as mediator, Rodriguez and Daniel Rangel ironed out

their differences over the course of an extended lunch.  Afterward, Garlick drafted

a document that the parties refer to as the "Miami Agreement[,]" which outlined

their basic obligations to one another.  Generally, Rodriguez agreed to

"[i]rrevocably [c]lose[]" Rismed's lawsuit and give Daniel Rangel an ownership

interest in a side business, while Daniel Rangel agreed to provide capital to that

company and to give Rodriguez an ownership position in his own side business.

Both Rodriguez and Daniel Rangel signed the Miami Agreement on March 28,

2013.

Next, the parties' attorneys set to work drafting a settlement agreement.  The

6

document they created more or less provided that the parties would release any

claims they may have had as a result of the IVSS imbroglio and that Rodriguez

would transfer shares in his side business to Daniel Rangel.  Notably, however, the

Settlement Agreement did *not* incorporate every obligation outlined in the Miami

Agreement.  Despite being advised by his attorneys that the Settlement Agreement

did not protect him to any meaningful degree and that he should not sign the

document, Rodriguez did so anyway on April 3, 2013.  So too did Daniel Rangel.

The next day, pursuant to Rodriguez's obligations under the Miami

Agreement, Rismed Oncology filed a motion to voluntarily dismiss its complaint

with prejudice, "as a settlement ha[d] been reached in th[e] action."  Four days

later, Rismed filed a second motion to voluntarily dismiss its complaint with

prejudice that was exactly the same as the first, except for the addition of one

paragraph.  That paragraph, in full, stated:

> [c]onsent [for a voluntary dismissal] has been obtained from the
> domestic parties[,] all of whom have been served in this matter.  The
> foreign parties have not stated a position with regard to the dismissal
> (Rismed Dialysis Systems, C.A. (Venezuela), Daniel Esgardo Rangel
> Baron, [and] Isabel Rangel Baron).

The district court granted Rismed's motion on April 9, 2013.  It noted that Rismed

had served its complaint on the Domestic Defendants, who consented to the

dismissal, but had not effected service on the Foreign Defendants, who "ha[d] not

stated a position on the issue."  Nevertheless, the court dismissed all claims,

7

against all defendants, with prejudice.

Nearly eight months passed when, on November 22, 2013, Rismed Oncology filed a motion for relief from the above order, pursuant to Federal Rules of Civil Procedure 60(b)(3) and 60(b)(6).[4]  Rismed premised this motion upon newly-discovered "fraud, misrepresentation, deceit[,] and illegality" by which the Defendants obtained the Settlement Agreement, which agreement was the reason Rismed voluntarily dismissed its claims with prejudice.

Essentially, Rismed alleged that Daniel Rangel only negotiated, agreed to, and partially performed under the Settlement Agreement to "buy time" to finalize and complete Rangel Baron's scheme and that he had no intention of fulfilling his end of the bargain.  Specifically, Rismed claimed that Daniel Rangel engaged in this conduct to enable his mother, Liliana Di Nardo Rodriguez ("Di Nardo")—Rodriguez's wife at the time and Rangel Baron's ex-wife—to fraudulently transfer and sell two properties that belonged to Rodriguez.  Upon completion of these transfers, Di Nardo divorced Rodriguez and moved to Caracas to be with her ex-husband, Rangel Baron.  Daniel Rangel cut off all communication with Rodriguez. Rismed claimed that given these actions, the Settlement Agreement and order dismissing its lawsuit should be set aside.

---

[4]  Before then, though, Rismed, Rodriguez, and two other companies filed suit in Alabama state court against a number of individuals, including Daniel Rangel, Rangel Baron, and Garlick, alleging various fraud claims.  After hearing oral argument, the state court dismissed the action in a one paragraph order, which was not appealed.

In a thorough order, the district court denied Rismed's motion.  As to its Rule 60(b)(3) claims, the court found Rodriguez's reliance upon any fraud to be unreasonable, given that he was represented by counsel, understood the importance of the Miami Agreement, and deeply desired to resolve the dispute in order to repair familial relationships.  As the court wrote: "[i]n short, [Rodriguez] closed his eyes where ordinary diligence required him to see, and thereby was willingly deceived."  With respect to the Rule 60(b)(6) claims, the court found them improperly classified, as they hinged upon fraudulent acts of Daniel Rangel and Di Nardo, and Rule 60(b)(6) "applies only to conduct that does not fit within the first five clauses of Rule 60(b)."  Again, the court questioned Rodriguez's level of ignorance as to Daniel Rangel's and Di Nardo's actions and motivations.

Following the court's denial, Rismed filed two motions.  The first was a lengthy motion for reconsideration, citing, among other things, (1) errors in the court's consideration of Di Nardo's fraudulent transfers and the role they played in the Settlement Agreement, (2) errors in the court's consideration of Garlick's role in Rodriguez's and Daniel Rangel's lives, and (3) the need for full discovery.  The court granted this motion, allowing the parties a limited period of time to explore "the issue of whether [Rodriguez] was tricked or induced by fraud into executing the 'Settlement Agreement' that precipitated the dismissal of [Rismed's] action on April 9, 2013."  Rismed's second motion noted that it had finally served the

Foreign Defendants with process and asked the court to set aside its order of

dismissal under Rule 60(b)(4), which Rismed now claimed was void since it

addressed previously unserved parties.

Reconsideration of Rismed's motion, additional briefing, and "hundreds of

pages of evidentiary materials" did not change the court's mind.  It still concluded

that Rismed Oncology failed to produce "'clear and convincing evidence that an

adverse party obtained [the dismissal of this action with prejudice] through fraud,

misrepresentation, or other misconduct.'"  In particular, the court noted that

Rodriguez had the support of counsel throughout the settlement process and

understood that the settlement document had to reflect the Miami Agreement to

retain its protections.  Yet, Rodriguez still chose to sign the Settlement Agreement

and dismiss Rismed Oncology's action anyway because he "got [his] son and

grand kids back[.]"  Thus, the court concluded, Rismed failed to show Rodriguez's

reliance on "the alleged frauds that led to dismissal of [Rismed's] action" was

reasonable under the circumstances.  The court did not address Rismed's 60(b)(4)

motion, denying it as moot.

Rismed later tried one final motion for reconsideration, but the court

affirmed its earlier findings in a summary order.  This appeal followed in

December 2014.

## II.    STANDARD OF REVIEW

We generally review a district court's denial of relief under Rule 60(b) for

an abuse of discretion.  *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271,

1275 (11th Cir. 2008); *see, e.g.*, *Aldana v. Del Monte Fresh Produce N.A., Inc.*,

741 F.3d 1349, 1355 (11th Cir. 2014) (reviewing a 60(b)(6) ruling for abuse of

discretion).  "'A district court abuses its discretion if it applies an incorrect legal

standard, applies the law in an unreasonable or incorrect manner, follows improper

procedures in making a determination, or makes findings of fact that are clearly

erroneous.'"  *Fed. Trade Comm'n v. Nat'l Urological Grp., Inc.*, 785 F.3d 477,

481 (11th Cir. 2015) (quoting *Citizens for Police Accountability Political Comm. v.

Browning*, 572 F.3d 1213, 1216–17 (11th Cir. 2009)).

A Rule 60(b)(4) ruling receives a more stringent review, however.  Because

the validity of a judgment or order is a question of law, "'[w]e review de novo . . .

a district court's ruling upon a Rule 60(b)(4) motion to set aside a judgment as

void[.]'"  *Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 854 (11th Cir.

2010) (quoting *Burke v. Smith*, 252 F.3d 1260, 1263 (11th Cir. 2001)).

## III.    ANALYSIS

### A.    The District Court Did Not Err By Denying Rismed's Rule 60(b)(4) Claims

Federal Rule of Civil Procedure 60(b)(4) provides a means by which a court

can relieve a party from a void judgment or order.  Fed. R. Civ. P. 60(b)(4); *see*

*Burke*, 252 F.3d at 1263.  When evaluating a Rule 60(b)(4) motion, the district

court possesses no discretion: "the judgment is either void or it is not."  *Burke*, 252

F.3d at 1267.  The remedy for a void judgment or order is similarly limited—the

only relief available is for the court to set it aside.  *Id.*  "Generally, a judgment is

void under Rule 60(b)(4) 'if the court that rendered it lacked jurisdiction of the

subject matter, or of the parties, or if it acted in a manner inconsistent with due

process of law.'"  *Burke*, 252 F.3d at 1263 (quoting *In re Edwards*, 962 F.2d 641,

644 (7th Cir. 1992)).

> Regarding the order from which it seeks relief, Rismed Oncology argues that
>
> [t]he claims against the Foreign Defendants could not have been dismissed with prejudice, because the [district court] lacked the authority to effect such a dismissal over the Foreign Defendants, as they were never served.  Where service of process is insufficient, the [district court] has no power to render judgment, and the judgment is void.

Rismed further notes that the Foreign Defendants were not parties to the Miami

Agreement or Settlement Agreement and never consented to nor presented a

position on its motion for dismissal.  Boiled down, Rismed's argument is that the

district court could not dismiss the Foreign Defendants because they were neither

served nor waived service.  The court's order is therefore void, Rismed claims, and

must be set aside.  For the following reasons, we disagree.

> This Court has previously stated that "[g]enerally, where service of process

is insufficient, the court has no power to render judgment and the judgment is

void." *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1299 (11th Cir. 2003)

(citing *Varnes v. Local 91, Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1368 (11th

Cir. 1982) and *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314

(1950)).  That is so because insufficient service of process "implicates personal

jurisdiction[,]" and personal jurisdiction "'recognizes and protects an individual

liberty interest.  It represents a restriction on judicial power not as a matter of

sovereignty, but as a matter of individual liberty.'"  *Id.* (quoting *Ins. Corp. of

Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701–03 (1982)).

Typically, insufficient service of process on a party operates to prohibit a

court from entering a default judgment against that party.  *See, e.g.*, *id.* at 1298–

1301 (affirming denial of motion to set aside default because defendant waived

objection for insufficient service of process) and *Varnes*, 674 F.2d at 1370

(reversing with directions to vacate default against party not properly served).

This is true generally of personal jurisdiction, of which service of process is a

subset.  A court cannot enter a binding judgment against a party over which it lacks

personal jurisdiction.  *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957)

("Since *Pennoyer v. Neff*, this Court has held that the Due Process Clause of the

Fourteenth Amendment places some limit on the power of state courts to enter

binding judgments against persons not served with process within their

boundaries.") (internal citation omitted); *see generally Louis Vuitton Malletier,*

13

*S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) (affirming denial of 60(b)(4)

motion because defendant had sufficient minimum contacts) and *Baragona v.*

*Kuwait Gulf Link Transp. Co.*, 594 F.3d 852 (11th Cir. 2010) (affirming order

vacating judgment for lack of service and minimum contacts).

   Rismed Oncology believes these concepts should also extend to prohibit a

court from entering an order *dismissing* claims against a defendant that has not

been served.  Yet Rismed cites no authority that supports such an application, nor

can we find any.  In contrast, dictum in *Varnes* implies that a court may dismiss a

complaint that was not properly served upon all the parties against which it was

filed.  674 F.2d at 1370 ("Moreover, the reason given for dismissal of the

complaint against [the served party], if valid, also required dismissal of the

complaint as to [the unserved party].").  And in the context of the Prison Litigation

Reform Act a district court may, "prior to service of process," dismiss a complaint

that is frivolous, malicious, fails to state a claim upon which relief can be granted,

or seeks monetary relief from a defendant who is immune from such.  *See, e.g.*,

*Neitzke v. Williams*, 490 U.S. 319, 324 (1989) and *Caldwell v. Warden, FCI*

*Talladega*, 748 F.3d 1090, 1096 n.11 (11th Cir. 2014).

   Further, Rismed's theory of service and personal jurisdiction conflicts with

Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5), and would restrict a

plaintiff's ability to dismiss its complaint under Rule 41(a)(2).  That is, if a court

14

could only dismiss claims asserted against a party over which it possessed

jurisdiction, as Rismed suggests, it would lose the ability to grant a motion to

dismiss for lack of personal jurisdiction or insufficient service of process.  Fed. R.

Civ. P. 12(b)(2), (5); *cf. PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598

F.3d 802 (11th Cir. 2010) (affirming grant of motion to dismiss for lack of

personal jurisdiction) and *Prewitt Enters., Inc. v. Org. of Petroleum Exporting

Countries*, 353 F.3d 916 (11th Cir. 2003) (affirming grant of motion to dismiss for

lack of service of process).  And requiring that a court possess jurisdiction over a

defendant in order to dismiss claims against that party would engraft an additional

element onto Rule 41(a)(2), which permits a court to grant a plaintiff's motion to

dismiss its complaint so long as no defendant has pled a counterclaim (or, if one

has, so long as the counterclaim can "remain pending for independent

adjudication").  Fed. R. Civ. P. 41(a)(2); *cf. Pontenberg v. Boston Scientific Corp.*,

252 F.3d 1253 (11th Cir. 2001) (discussing Rule 41(a)(2)).

Finally, the order from which Rismed seeks relief is different in kind from

the judgments for which this Court normally requires personal jurisdiction to exist.

Here, the district court granted Rismed's motion to dismiss *its own complaint* with

prejudice.  The court's order concerns the unserved Foreign Defendants only

insofar as it did away with the claims against them, but it does not *bind* the Foreign

Defendants in the same manner as it does Rismed.  Notably, until the court ordered

them to respond to Rismed's motion for relief, no defendant had filed an answer,

motion to dismiss, or counterclaim or otherwise made an appearance in the case.

Thus, by dismissal of the suit against them, the Foreign Defendants lost nothing; to

the contrary, their anxiety over litigation, if they had any, was eliminated. *Contra*

*Int'l Shoe Co. v. State of Wash., Office of Unemp't Compensation & Placement*,

326 U.S. 310, 316 (1945) ("Historically the jurisdiction of courts to render

judgment in personam is grounded on their de facto power over the defendant's

person. Hence his presence within the territorial jurisdiction of [the] court was

prerequisite to its rendition of a judgment personally binding him.") and *Pennoyer*

*v. Neff*, 95 U.S. 714, 729–34 (1877) (discussing "the force and effect of judgments

rendered against non-residents without personal service of process upon them"),

*overruled in part on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977). In

short, the district court did not err by denying Rismed Oncology's Rule 60(b)(4)

claims, because its order was not void.[5]

## B.    The District Court Did Not Err By Denying Rismed's Rule 60(b)(6) Claims

Rule 60(b)(6) is a "catchall provision"; it permits a court to "relieve a party

from a final judgment 'upon such terms as are just,' provided that the motion is

---

[5] We express no view on whether Rismed might be able to pursue an action against the Foreign Defendants. *Cf. Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004) (res judicata effect of dismissal based on settlement agreement is determined by the terms of the agreement "as interpreted according to traditional principles of contract law").

made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 and n.11 (1988) (citing *Klapprott v. United States*, 335 U.S. 601, 613 (1949) and 11 C. Wright & A. Miller, Fed. Practice & Procedure § 2864 (1973)); *Cano v. Baker*, 435 F.3d 1337, 1342 (11th Cir. 2006).

Relief under Rule 60(b)(6) "'is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances[,]'" and that "absent such relief, an extreme and unexpected hardship will result." *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) (quoting *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984)); *Galbert v. W. Caribbean Airways*, 715 F.3d 1290, 1294 (11th Cir. 2013) (same).  In other words, the movant "'must demonstrate a justification so compelling that the district court was required to vacate its order.'"  *Galbert*, 715 F.3d at 1294 (quoting *Cano*, 435 F.3d at 1342). However, even under exceptional circumstances, the decision to grant Rule 60(b)(6) relief is a matter for the court's sound discretion.  *Id.* at 1294 (citing *Cano*, 435 F.3d at 1342 and *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. Unit A 1981)).

Here, Rismed claims an entitlement to relief from the district court's order because "*several* conflicts of interest [] existed between Garlick's role as facilitator (or mediator) and his relationship with [] Rangel, which extended not only through

mediation, but the Settlement Agreement, and dismissal." (Emphasis in original.)
Specifically, Rismed notes that Garlick and Daniel Rangel engaged in a for-profit
joint venture to sell "Bibles, Music, and Biblical Resources" and that Daniel
Rangel personally wired Garlick a total of $60,000 ($10,000 of which was a
personal gift to help his sick child). Had Garlick disclosed this relationship,
Rodriguez claims he would not have participated in the mediation and therefore
would not have voluntarily dismissed Rismed's lawsuit. This bias and prejudice,
Rismed believes, entitles it to relief under Rule 60(b)(6). Again, we disagree.

As noted, to obtain relief under Rule 60(b)(6) a movant must demonstrate
"exceptional circumstances" that will lead to "extreme and unexpected hardship"
without court intervention. *Griffin*, 722 F.2d at 680. The circumstances must be
"so compelling that the district court was required to vacate its order." *Galbert*,
715 F.3d at 1294. The district court below did not abuse its discretion by
concluding that Rismed has not identified such circumstances in this case.

First, Rodriguez claims he relied upon Garlick's advice and guidance when
negotiating the Miami Agreement and Settlement Agreement with Daniel Rangel,
and that Garlick led him astray because of the latter's undisclosed relationship with
Rangel. However, Rodriguez was represented by counsel throughout the
settlement process. Though Garlick "frequently told the parties to not use their
attorneys, [Rodriguez] always used [his] attorney . . . because [he] needed [his]

18

attorney's assurance that the settlement agreement was drafted fair[ly] and accurate[ly], and with the appropriate legal terms understood and accepted in the United States."  Further, Rodriguez "relied on [his] attorney for making all the changes to the [Settlement Agreement,]" who did so "because [] the initial [] agreement did not settle [the parties'] disputes, but only dismissed [Rismed's] claims in the federal lawsuit."  Nevertheless, despite his continued reliance on his attorneys, and in spite of being twice instructed by them *not* to sign the Settlement Agreement, Rodriguez did so anyway.

Rodriguez argues that his decision to sign the Settlement Agreement resulted from Garlick's deception; that is, Garlick told him "the attorneys had worked into the night finalizing the legalities of the document" and that it had "been . . . approved . . . and was ready for the parties' signatures."  Assuming that Rodriguez was so swayed by this representation as to deviate from his practice of conferring with his attorneys and to sign the Agreement without their blessing, Rodriguez and his attorneys had six days from that point until the court granted Rismed's motion to read the document and confirm it accurately reflected the parties' agreement. Moreover, Rodriguez used the very same attorneys who warned him not to sign the Settlement Agreement to file *both* of Rismed's motions to voluntarily dismiss its case.  So if Garlick did pressure or otherwise unduly influence Rodriguez into signing an unfinished Settlement Agreement that did not accurately reflect the

19

parties' intent, Rodriguez had the opportunity to correct that error, and he failed to do so.

Second, even if Rodriguez *had* relied on Garlick's advice during the settlement negotiations, he was not unfamiliar with the minister and his connection to Daniel Rangel.  At the time, Rodriguez had known Garlick for more than ten years and "loved him like a brother."  Garlick stayed at Rodriguez's home occasionally, and the latter approached the former for guidance when experiencing deep personal and family troubles.  Further, Rodriguez had his own financial ties to Garlick, providing him with a credit card and making monetary donations to and for Garlick's ministry over the years—including during the pendency of the lawsuit, settlement, and dismissal of Rismed's action.  And Rodriguez encouraged Daniel Rangel to assist Garlick with his sick child and to consider business with the minister.

Related to this latter point, Rismed Oncology asserts that Garlick, as a Christian mediator, should be held to the same disclosure and recusal standards that 28 U.S.C. § 455(a) and *Liljeberg*, 486 U.S. 847, impose upon "justice[s], judge[s], [and] magistrate judge[s] of the United States[.]"  In support, Rismed points to *CEATS, Inc. v. Cont'l Airlines, Inc.*, 755 F.3d 1356 (Fed. Cir. 2014).  But in that case a district court ordered the parties before it to engage in mediation, and appointed a magistrate judge as mediator.  *Id.* at 1358.  Here, however, there is no

20

suggestion the district court recommended, in any way, that the parties attempt to resolve their dispute through formal mediation, nor was Garlick a court-appointed mediator (let alone a federal justice, judge, or magistrate judge). Rather, Rodriguez and Daniel Rangel, of their own volition, resolved their dispute over a long lunch in Miami with their friend and minister, Garlick, whom they chose to act as facilitator. Rismed Oncology cites no authority that applies the § 455 and *Liljeberg* disclosure standards in such circumstances, nor can we find any.

Also, even though the *CEATS* court held that the mediator there should have disclosed his relationship to the parties involved in the litigation, it nevertheless affirmed the district court's denial of Rule 60(b) relief. *Id.* at 1358, 1361–67. Given the above, and even assuming Rodriguez's ignorance that Garlick might have felt more loyalty to Daniel than to Rodriguez, the *CEATS* holding provides no support for Rodriguez's position. In summary, the district court did not abuse its discretion in finding that Rismed has not identified circumstances sufficiently extraordinary to warrant Rule 60(b)(6). *See Liljeberg*, 486 U.S. at 864 ("Rule 60(b)(6) relief is accordingly neither categorically available nor categorically unavailable for all § 455(a) violations."); *compare Cano*, 435 F.3d at 1341–42 (scientific developments and alterations to Supreme Court precedent were not sufficiently compelling justifications that district court was required to vacate its order).

21

We therefore **AFFIRM** the district court's order denying Rismed

Oncology's request for relief.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 17, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 14-15567-EE
Case Style: Rismed Oncology Systems, Inc. v. Daniel Baron, et al
District Court Docket No: 5:13-cv-00310-CLS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against the appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Sandra Brasselmon, EE at (404) 335-6181.

Sincerely,

DOUGLAS J. MINCHER, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs